Case 11-3135 Donlan v. The Linn Group One way would be that they know, or this gentleman, Mr. Pearl, knew of the mental incapacity. What evidence do you have that he knew of this mental incapacity? The wife got on the phone and said, my husband's suffered a stroke. He doesn't know what he's doing. Stop doing business with him. And that's the notice. I think my wife would tell my broker that all the time. Point well taken. But we also have Mr. Moore saying that in the conversations that he had with the broker, the broker was treating him as if he were mentally incompetent. Treating him as if he were a child. Having to explain things over and over. Demanding, listen, you've got to get this done. You've got to do it. So not only did they have the notice, but they actually acted on it. They treated him like a child, like someone who's mentally incompetent. That's what we've alleged. We're at the pleading stage. You know, because you treat somebody as a child, is that really evidence that he, of knowledge of the mental incapacity? See, that's the problem that you have. I mean, you have this mountain to go through. And the second thing is I think you claim that he was advised to make these risky deals. Yes. But you have no evidence that he was, that the broker advised him to do this. How could he, how could he, it's a crazy strategy. How could he. Well, any broker would know not to do this. Exactly. Exactly. That's what you're telling us. It's so obvious that. That's exactly right. And so they've got a duty to say, hey, you're never going to make, the only people who are going to make money on this is us. You're never going to make any money on this. And that is a breach of their duty. To go further, we've never presented on this motion an affidavit from an expert in the field who would say that any broker would know that a man's got to be out of his mind to make this transaction. I mean, you didn't present any expert testimony. Well, I don't, I mean, I don't know if I need, I mean, I don't know if I need that. You don't need to. I mean, if you're trying a case in a court of law, you know, you have to have some, you have to have evidence. The burden is on the plaintiff. I didn't get that far. I understand that. But, you see, on a motion to dismiss, it's the same thing. You've got to make these showings. Well, I mean, I've certainly alleged it. They haven't. I know you alleged it. But they haven't. It's more than alleging. They haven't rebutted that. And, you know, like I said, is that, you know, once we get to discovery, I mean, we certainly have consulted. We have got two consultants on this case. Whether it was necessary to go into that expense at this stage seemed premature to me. But it is, this is the problems with a 619 motion that, you know, the 619 motion is, you know, it's not a so what, like a 615, but it's a yes, however motion. And it's an issue of fact whether or not this was a good strategy or was not a good strategy. This is a 2619A9, right? And you were asserting affirmative matters. Yes. Right? What exactly were the affirmative matters that you were asserting? No, I'm not asserting them. They're asserting them. But that's what I meant. What were they? They're saying there's no, they're basically saying that there's no duty, fiduciary duty, of a broker when dealing with a mentally incompetent person. They're saying that we're just following orders. That's their defense. And even though the orders came, even though the orders were, number one, crazy, had no investment objective, and came from, and they had noticed that the man was crazy, and they treated him like he was crazy, they still say we're just following orders. Boy, and those orders were very lucrative to them. Made them $100,000 with, as we've alleged, almost impossible to make any money for the man. And they did not even disclose that to him. So let's put the mental condition aside for a moment. Was there a fiduciary relationship here between the brokers and Donovan? The case law says that there's always a fiduciary duty between a commodity broker and his customer. The scope of that duty is, it depends on the relationship. But even in the case we cite, the Kahn case, there's a duty of dealing with, of fair dealing and a fiduciary duty involved before you even sign up. The broker has to, has a duty to, of honesty, of giving good advice, of all sorts of fiduciary things, even before there's a contractual relationship. Then, once there is a contractual relationship and orders are being given, they've got the duty to execute those orders. But they've also got the duty to give good advice, which his saying was breached when they didn't tell Mr. Donovan about the impossibility of him making any money. And also there's even a bigger duty, a greater duty. Didn't they submit affidavits that allege that they explained the trades, that they went into great detail about some of the trades and the strategies that were being implemented here? But the affidavit of Mr. Moore contradicts that. They weren't explaining things. They were just demanding that he do these things. So, again, another issue of fact at trial. These conversations with customers, they're tape recorded. Once they get to discovery and get those tape recordings, then we're going to have a much better picture of what was going on. Well, shouldn't you have asked for all those things before the motion was decided? At a 619 motion, I don't think I can. Why not? It's based on the pleadings. Well, you could always ask the contract officer. They're saying we got one, but they don't exist. But I've asked them for them, sure, but they haven't turned them over. They turned one over. You see, those discovery things should be done before the court rules on the motion. Right, but he wasn't even getting at the court. The lower court wasn't even allowing him to get to that spot. It's exactly what we're saying here, Judge. A 619 is supposed to admit everything. But for an affirmative matter, there's a release. Yeah, but there's nothing in the record. There's a set of limitations. There's a res judicata. Those are the type of things that are 619 motion, not an affidavit from the broker saying everything in the complaint isn't true. That's what they've given us. Following up with Justice Gordon's question, though, in order to prepare a response, you would need to be able to know what we're dealing with, right? So you would need to have discovery answered. That's why the 619 motion, that's a summary judgment motion. And I've come across this across the street, is that more and more defendants are trying to use 619 motions as summary judgment motions. And, you know, as we said in the They've been doing it since the 2619 was passed. I mean, you know, that's why it's important to gain the discovery before the ruling on the motion. If a court would disallow discovery, I mean, we would reverse them in a heartbeat. But they didn't even get to issue. They didn't even have the found answer in this case. They had a motion to dismiss the complaint under 619. I went down to Florida and gathered all these affidavits to rebut their assertions. I did some discovery. But as far as getting things from, you know, I'm in another case with the Lynn Group. Well, I mean, you're talking about, you know, that there's recorded conversations. You see, that would be how you could prove your case. Without that, I don't know how you can prove your case. Exactly. Once we get to issue, I'm going to ask for those things. I'm going to ask for these things. You see, the system doesn't work the way you are presenting it. You know, see, unfortunately, it doesn't work that way. There is no rule that says that discovery occurs at a particular time. Judge, that's not the practice that I've experienced across the street. Well, I understand, you know, because 90 percent of the time it goes a certain way. But that doesn't mean people can't deviate from it, you know. I understand what you're saying, and I understand how frustrating it is. The tape recordings are not dispositive of the issue in front of this court today. No. What is dispositive is that we have set out a well-pleaded complaint, setting forth that Mr. Donilon was incompetent, unable to understand what he was doing, that the brokers had notice and, in fact, treated Mr. Donilon as an incompetent. That, therefore, they breached their duty, and just to go for the duty, when they took control of the account. How can a mentally incompetent person have control of a trading account? It doesn't make any sense. I have a question. In regards to the complaint, you indicate that you haven't finished discovery, but you make allegations about control, exercise of discretion. Where did you obtain this information? Well, common sense would tell the court and tell us that the lower court held that because Mr. Donilon was incompetent, the defendants could not enforce a one-year statute of limitation provision in the contract. My question goes more to these allegations that you're making in the complaint. They're founded on what basis? They're founded on the fact that if he's unable to be held to a contract because of his mental incompetence, then he's unable to be held. He could no longer control or have control of the trading in the account. Therefore, who was controlling the trading in the account? The trading in the account was controlled by the brokers, and by the brokers entering these trades, which had no discernible investment objective, but only raised them $100,000 in commissions for a couple months' work.  They used this account to enrich themselves at the detriment of Mr. Donilon. And that's the crux of the complaint, is that if a 12-year-old boy called up and said, I want you to make these trades, they would be breaching their duty to make these trades. It was only going to enrich them and to the detriment of the client. That's what we're saying here. The duty is they enrich themselves to the detriment of a mentally incompetent person. The case law backs up our position that a gullible person, a naive person, certainly a mentally incompetent person is owed a duty by a commodity broker, and not for the commodity broker to enrich themselves to the detriment of the customer. But don't you have to prove that the commodity broker knows this? Yes, we've alleged that. No, I understand you allege it, but now it becomes an issue. What proof do you have of this fact? And the only proof that you have of this fact that you've told me is that the broker talked to him like he was a child. And the wife got on the phone and said, my husband's had a stroke. That stroke has made him mentally incompetent, that he does not know what he's doing. Sometimes he doesn't even know who I am. Those are specific factual allegations that would put the broker on notice. Judge, in the Landon case that we cite, no, I'm sorry. One of the cases that we cited that's in the brief, Judge, the Hasse case, that the broker had a duty to investigate a befuddled customer. In dealings with the customer, the customer seemed that he did not know what was going on. The word was befuddled. And they imposed a duty on that broker to investigate that. And so that's what happened in this case. They had notice. They had not only notice from the wife, but they treated him. They acted on that notice. And the duty to investigate, you know, let's go over this further. They're saying that when we can't talk to the wife, you know, she's going to have a power of attorney. That's a red herring, the power of attorney. You know, there's an affirmative duty to investigate whether or not this client knows what's going on. And they did not investigate that. A further brief of their duty here, Mr. Justice. So for all these reasons, we've laid it all out. I'm not saying this is going to be an easy case when we get to trial. It's going to be a tough case. But that depends on the demeanor of Mrs. Dylan, the demeanor of Mr. Moore, the demeanor of Mr. Pearl. You know, whatever else we can get from the defense, we're not there yet. Let us get there. And maybe we'll be back here, and I'll be on the other side of the table, defending the ruling in our favor. Thank you. Thank you. Any response? Good morning, Hunters. Once again, Robert Trisna for the defense. Before you start, you know, I'd like to know what your response is to the fact that the wife calls and puts the broker on notice that the husband is incompetent. What do you have to say about that? Well, there is an allegation to that effect. There's an affidavit to that effect. The wife doesn't have any standing to make that call and to make a determination or to act on behalf of her husband in this situation. Well, wouldn't it put the broker on notice that he should investigate? No, you're not. Well, number one, I don't believe a simple phone call by someone claiming to be Mr. Donlan's wife and saying he's incompetent is necessarily imposing a duty or necessarily imposes a duty on a commodities broker who is not a fiduciary and whose only duty to his customer is to execute the trades as directed by the customer. You cannot have an agent act as an agent purely because the agent declares herself to be so. Mr. Donlan never appointed his wife as his agent, assuming this person was his wife. Mr. Donlan never acquiesced in her action as an agent. He never ratified her action as an agent. Mrs. Donlan, assuming it was his wife, is a total stranger to this transaction with no authority whatsoever. There is no indication that any competency proceeding had ever been initiated, much less that Mr. Donlan had ever been adjudicated incompetent. Let me ask a question. Mr. Donlan, based on the briefs and the record we know, was not totally inexperienced in this area in terms of trading. Yet they argue that the broker had to basically talk to him as a child and explain step by step what strategies and how the trades were being conducted. If he's an individual who's experienced in this area in terms of making trades, would that put the broker on notice that there's something amiss? Your Honor, first of all, this actually addresses a question that you asked the appellant here. The testimony that you're referring to comes from a Mr. Moore. Mr. Moore, by his own affidavit testimony, moved out of the Donlan household on the 4th of February 2006. These conversations that he alleges occurred, and our employee, Jeff Pearl, denies that it occurred, but even if you assume for a moment that they occurred, they occurred no later than February 4, 2006. At that time, the account had not even been opened. At that time, no trades could be made because the account wasn't open. The account wasn't open until March 7, 2006. The first trading didn't occur until May of 2006. The Moore affidavit, if you read through those paragraphs at appendix 34, paragraphs 34 through 38, basically say he talked to him like a child. He told him to do this right away. He told him this, that, and the other. Never said Mr. Donlan acted on that advice. Mr. Donlan took that direction because, in fact, he couldn't. There was no account open, and no trading occurred until May of 2006. From May 2006 through August of 2006 is when the trading occurred. Mr. Moore was well gone by then. He had been gone from that household for months and was no longer serving as Mr. Donlan's caretaker. The basic essence of this case here is simply that a broker of a nondiscretionary account does not have, under Illinois law, under the first American case, does not have a fiduciary duty to his principal, to his customer. His only duty is to execute the trades as directed. There is no allegation anywhere in the complaint. There is no allegation anywhere in the affidavits that the Linn Group or Mr. Pearl, acting on behalf of the Linn Group, did not execute a trade as directed by Mr. Donlan. They did exactly what they were supposed to do for a customer who represented himself as having $50 million worth of assets, making $2 million a year, being involved in trading for a number of years, and actually having traded this same strategy and these same types of trades with another brokerage house months before he came to the Linn Group. What about the argument that the trades actually were outrageous, but yet the commissions were pretty substantial? Your Honor, people trade in ways that, frankly, I don't understand, and a lot of people don't understand. In point of fact, it's not up to the Linn Group to determine whether their customer, who has a nondiscretionary account, is trading in a way that they might trade if it was a discretionary account or trading in any other way. That's not a value judgment that they make when they're in a situation such as this with a nondiscretionary account. If they would refuse to trade as they're directed, they would be liable to their own principle for failing to discharge their duty as a broker of a nondiscretionary account to take direction and act on it faithfully, promptly, in the fashion that's been directed. So the commissions really have nothing to do, have no effect on this dispute because they're not an issue. It's a sideshow, if you will. The real key here is what was the Linn Group charged with doing and did they do it? And, in fact, they did. You're telling us that they have no duty to investigate anything. Your Honor, we believe that in this situation they have no duty to investigate. But even if they had a duty, they did investigate. Mr. Pearl's affidavit, totally uncontroverted on these points, said that he had been talking to Mr. Donlin for a number of – for a period of time before the account was opened. He talked to him regularly about the account and the trades. Mr. Donlin made all of his trades by telephone. So in each instance, Mr. Pearl was talking to Mr. Donlin. The trades weren't being made by e-mail or by fax or some other means where he couldn't judge on his own independently whether Mr. Donlin seemed to be making sense, whether Mr. Donlin seemed to know what he was doing. In fact, Mr. Pearl's affidavit says just that, that he was – he understood things. He knew about the markets. He wanted to do a variety of things. And so, in effect, Mr. Pearl was conducting an ongoing investigation even before he arguably was notified, not given knowledge, but just simply notified. He doesn't say in his affidavit that he received a telephone call from the wife and that he asked the man whether he has memory lapses and things of that nature. He does not. In fact, I believe in his initial affidavit, he says he never had a conversation with Mrs. – or he didn't. He doesn't even address the issue of Mrs. Donlin having a conversation because it wasn't raised at that time. When it subsequently was raised, he filed a supplemental affidavit in which he said the only conversation he had with someone purporting to be Mrs. Donlin was when Mrs. Donlin was on the phone with Mr. Donlin and they were talking about the potential for getting a big payday if there was a storm in the Gulf, another Katrina. The only previous conversations that Mr. Pearl testified to having with someone identified as Mrs. Donlin, and that itself is a question of fact that hasn't been established in any way or alleged other than in a conclusory fashion, but his only conversation would be when he called Mr. Donlin and when some female would answer who assumed to be Mrs. Donlin, who would then hand the phone to her husband. Let me ask you the same question. All right, so this was on a motion to dismiss pursuant to 2619A9. That's correct, Your Honor. What is the affirmative matter? The affirmative matter were the account documents that, number one, established that this was a nondiscretionary account. It also – the account documents that also identified Mr. Donlin as a $50 million net worth person with $2 million a year of income and with a long and varied experience in the trading of commodities and other securities. So that was something that was not part of the complaint. Interestingly enough, a lawsuit brought on breach of fiduciary duty and consumer fraud directed to a commodities account with no attachment, no inclusion of the contract and the other documents that were used to open that account. So that was our fundamental A9 material. All right, and what about the other question with regards that it's too soon, that discovery wasn't completed here, that this case, in a sense, shouldn't be here? Your Honor, discovery could have been commenced immediately after the appearance was filed years ago. The excuse that Mr. Muldoon gives is not viable under the circumstances because there was plenty of opportunity for discovery. In fact, there is no discovery that could solve this problem. There is no discovery that would turn this account from a nondiscretionary account to a discretionary account based on the allegations. There are no allegations that say that the Linn Group acted on its own account, acted on its own behalf, acted with discretion to place any of these orders. They've never controverted Mr. Pearl's statement that every transaction that was made, every trade that was placed, was placed solely, exclusively at the direction of Mr. Donilon. So it's effectively, in this case, it would be a nonissue. We believe that Judge Preston properly granted the 2619 motion because there is no set of facts based upon the accepted Illinois law, long-standing Illinois law, of a presumption of competence for any person and the limited duty that a nondiscretionary broker has towards a nondiscretionary account in individual trades themselves. Even if somehow one could invalidate the initial account opening documents, each individual trade, irrespective of an account agreement, each individual trade was directed by Mr. Donilon. So each individual trade was also nondiscretionary. But that also includes the Consumer Fraud Act? The Consumer Fraud Act, Your Honor, depends upon some type of fraudulent activity. Again, this is an attempt to leverage a claim of incompetence with no finding of incompetence, no adjudication, and actually no solid evidence of it into a consumer fraud scheme when there was none, as Judge Preston properly found. There was no misrepresentation of any facts or any information to Mr. Donilon. In fact, there was no representation whatsoever. They were simply taking orders. They weren't, for lack of a better term, a human order desk. Mr. Pearl just took the orders and executed them. And let me point out to the extent that Mr. Muldoon noted the deposition or affidavit testimony of Dr. McDonald and Dr. Dodd. Dr. McDonald never found that in his affidavit, never states that Mr. Donilon was incompetent. In fact, he conveniently dances around it. He refers to Mr. Donilon as not being able to comprehend the risks and responsibilities as set forth in the document. Doesn't say he's incompetent. Doesn't say anywhere in his affidavit that he's suffering from dementia. So interestingly enough, Dr. Dodd then turns around and says, I concur with Dr. McDonald that at the time I examined Mr. Donilon, he was suffering from dementia, even though that's not what Dr. McDonald finds. And if you look at Dr. Dodd's records underlying his affidavit, which are essential here because in order to satisfy the requirements of Rule 191, you'll see that there is a statement in Dr. Dodd's records saying that when he examined Mr. Donilon, he's a fine guy. He's in good shape. He's got a concern about Coumadin being rat poisoning. But in all other respects, he's sharp as a tack. Your Honor, we believe in this case that there is no set of facts that could be proved as alleged in the complaint to turn this into a viable claim for breach of fiduciary duty or a viable claim for violation of the Consumer Fraud Act. Thank you. Okay. Rebuttal. Dolly, do you have a case that would show us that there's a duty to investigate? Yes, there has to be. It's in that case. It's cited in our brief. Okay. And I would like to thank you, Justice Reyes, for asking the question. What is the affirmative matter? The answer was the account documents. These account documents I was in-house for a commodity firm. They're all the same. They're boilerplate. They're all the same. And if that is an affirmative matter to defeat a claim that a broker breached their fiduciary duty, then you might as well hold that brokers are not responsible for anything they do in the account. If brokers are going to be able to rely on this, he signed these papers, and therefore you can't bring a lawsuit against them, that's an affirmative matter 619, then give them the license to steal. Because if that's all it is, then we win this appeal. Because those documents cannot provide an affirmative matter. Again, that's not a yes, but it's a not true motion. Just to rebut a couple of things that were brought up. The Heastie case certainly gives the duty to investigate, given the fact that Mrs. Donnelly had this phone call. Pearl's affidavit does nothing more than create a factual issue, again, to be decided at trial. Again, Justice Reyes, thank you for the question regarding Mr. Donnelly's experience. They knew he was experienced. They knew he was successful. Why would he then throw a million dollars away at such an impossible investment? Without talking to the wife, without treating him like a child as experienced by Mr. Moore, that right there should have rung a bell. Hey, this is not right. Something's wrong with this guy. Why would he spend a million dollars on something that's never going to happen? Talking about Mr. Moore, if you look at his affidavit, he did move out in February, but he took care of Mr. Donnelly. He drove him to the bank. I looked again at the affidavit. He drove him to the bank where he made these wire transfers. He was confused about whether he had made it or not. I went back to him. No, he just did that, Mr. Donnelly. You don't have to go back. He would get upset with him. He witnessed three or four other phone calls with Mr. Pearl, with Mr. Donnelly, on the speakerphone. It wasn't just one conversation. It was a series of conversations during the same time when he's making these transfers to the bank. Go back and take a careful look at the affidavits of Mr. Moore. They're highly detailed about the timing of when all this was going on. It's at the exact time he's transferring the money that they're stealing from him. That's the timing of it. Mr. Pearl's affidavit is self-serving. It's biased. That's not going to come out again at the trial. All he's doing is contradicting the facts in the complaint. Mr. Trisna, who I get along very well with, he brought up the presumption of competence. The lower court, Judge Preston, got rid of that presumption of competence. He said he was not competent. He was not competent to be held to that account agreement. The same account agreement that they're showing is the affirmative matter. The lower court held that he's not competent to be held to this limitation. Therefore, that presumption of competence is gone in this case. That's not an issue. Again, they haven't raised a sufficient affirmative matter. The account documents do not protect them from the allegations of taking control of this account, dealing in their self-interest to the detriment of the client, where they make $100,000 for a few phone calls over a couple of months, while Mr. Donilon loses over a million dollars. Don't give commodity brokers a license to steal. We'll reverse the Court's judgment. Thank you. We thank you for your arguments and your briefs. It was very well done, and you've given us a very interesting case, and we'll take it under advisement. The Court is adjourned.